MISSOURI PACIFIC RAILWAY COMPANY V. CROWELL LUMBER & GRAIN COMPANY.

FILED APRIL 21, 1897. No. 7196.

Carriers: MISTAKE IN QUOTING FREIGHT RATES: OVERCHARGES: LIABILITY OF CARRIER. A railway company quoted to a shipper a rate on grain from Nebraska to Colorado, but by mistake the rate quoted was less than the usual rate. The shipper, relying upon the rate quoted, sold large quantities of grain to persons in Colorado, basing the price on such freight rate, the purchasers of the

grain to pay such freight on its delivery and the shipper guaranting that the rate should not exceed the one quoted to him by the railway company. This grain was delivered by the shipper to the railway company in Nebraska to be transported by it and delivered to the purchasers in Colorado. The last carrier, before it would deliver the grain to the purchasers, compelled them to pay a higher freight rate than that quoted to the shipper by the railway company. The shipper then paid to the purchasers this excessive freight and sued the railway company therefor. *Held,* That the mistake made by the railway company in quoting the freight rate caused the shipper to change his status, to his injury, and that the railway company was liable for the overcharge paid by the shipper.

ERROR from the district court of Douglas county. Tried below before BLAIR, J. *Affirmed.*

The opinion contains a statement of the case.

*B. P. Waggener, James W. Orr,* and *A. R. Talbot,* for plaintiff in error:

The special rates were quoted through mistake of the carrier's agent, and the contract based thereon provided for the violation of the interstate commerce law. The judgment for overcharges was therefore erroneous. (24 United States Statutes at Large, p. 79; *Chicago, R. I. & P. R. Co. v. Hubbell,* 54 Kan., 232; *Hawley v. Kansas & Texas Coal Co.,* 48 Kan., 593; *United States v. Michigan C. R. Co.,* 43 Fed. Rep., 26; *United States v. Tozer,* 39 Fed. Rep., 904; *Arkansas & L. R. Co. v. Smith,* 13 S. W. Rep. [Ark.], 929; *Dillingham v. Fischl,* 21 S. W. Rep. [Tex.], 554.)

*Connell & Ives, contra.*

RAGAN, C.

The Crowell Lumber & Grain Company (hereinafter called the grain company) is a corporation organized under the laws and doing business in the state of Nebraska. Its business consists very largely in buying and shipping grain. The Missouri Pacific Railway Company (hereinafter called the railway company) is a common

carrier doing business in Nebraska, Colorado, and other states. In the district court of Douglas county the grain company sued the railway company, alleging in its petition that on the 11th day of December, 1890, the railway company entered into a contract with it in and by which it agreed to transport grain in car-load lots from certain points in Nebraska to certain points in Colorado at a rate of thirty cents per hundred; that the grain company, relying upon this contract, purchased and shipped a large quantity of grain and sold it to persons at the said Colorado stations at a price based on said freight rate mentioned in said contract with said railway company, the purchasers of said grain to pay the freight on delivery, the grain company guarantying that the said freight should not exceed thirty cents per hundred, as provided by its contract with the railway company; that when the grain reached Colorado the delivering carrier charged and demanded of the grain company's purchasers, as a condition precedent to the delivery of the grain shipped to them, a freight rate largely in excess of the contract rate entered into between the grain company and the railway company; that the said purchasers, in order to obtain said grain, were compelled to and did advance and pay the freight rate demanded by the delivering carrier; and the grain company had been compelled to and had repaid to said purchasers the freight charges in excess of the rate fixed by the contract between the grain company and the railway company. In addition to a general denial, the railway company interposed to this action two defenses: (1) That it was induced to and did enter into the contract sued on, believing that the rate fixed in the said contract was the rate then in force for the transportation of such freight between said points as agreed upon by itself and other carriers then constituting the Trans-Missouri Freight Association; that said rate was, as a matter of fact, not then in force, all of which the grain company knew at the time of making the contract; and (2) that the contract made was void under

the provisions of the interstate commerce act.    The grain
company had a verdict and judgment as prayed, and the
railway company prosecutes here a petition in error.

1. The first assignment of error which we notice is that
the verdict is not sustained by sufficient evidence.    The
issues of fact made by the pleadings in the case were (1)
whether the railway company executed the contract
sued upon; (2) whether the freight rate on grain from
Nebraska to Colorado fixed by the Trans-Missouri Freight
Association was in force at the time the contract in suit
was made; (3) whether the grain company knew that the
rate fixed by the Trans-Missouri Freight Association had
been abolished at the time the contract was made; (4)
whether the grain company, relying in good faith upon
the contract sued on, purchased and shipped grain to
Colorado, there sold it, and guarantied that the freight
charges should not exceed the rate fixed by its contract
with the railway company; (5) and whether the grain
company, to make good its guaranty, had paid to its pur-
chasers the excess of freight charged and collected for
transporting the grain.

There is practically no conflict in the evidence as to the
first and fifth issues.

As to the second issue, the evidence tends to show that
the railway company and a number of other carriers, on
the 19th of July, 1890, became members of what is known
in this record as the Trans-Missouri Freight Association;
that this association fixed the rate for the transportation
of grain in car-load lots from certain points in Nebraska
to certain Colorado points at thirty cents per hundred;
that they caused to be printed and published a tariff sheet
setting out the rates fixed by this association and filed
this tariff sheet with the interstate commerce commission
on the 23d of July, 1890.    No such thing as a rule, consti-
tution, or by-law of this association is in the record, and
we are not certainly advised how any member of this
freight association might withdraw therefrom or cease
to be bound by the mutual agreement of its members,

But it seems that the association had not given the interstate commerce commission any notice of the modification or abrogation of the tariff fixed by it at least earlier than the 6th day of February, 1891, before which date the transactions had occurred out of which this suit grew.

As to the third and fourth issues, the evidence tends to show that prior to the making of the contract in suit the grain company had heard, or had been informed, that the rate fixed on grain from Nebraska to Colorado by the Trans-Missouri Freight Association had been abrogated or modified; that the officer of the grain company whose duty it was to look after freight rates called upon the assistant general freight agent of the railway company and told him that he had been advised of a modification or abrogation of the thirty-cent rate on grain to Colorado. This freight agent assured him that there had been no modification or change of that rate; that it was still thirty cents per hundred, and thereupon the contract in suit was entered into; that the grain company, relying upon the rate fixed in the contract, purchased and shipped large quantities of grain and sold it to Colorado parties, the purchasers to pay the freight on the delivery of the grain, the grain company guarantying that it should not exceed thirty cents per hundred; that the delivering carrier refused to surrender the grain unless it was paid a rate of thirty-nine cents per hundred; that the purchasers were compelled to pay this in order to receive the grain, and that the grain company, in pursuance of its guaranty with its purchasers, paid the excessive freight charges to their purchasers. The verdict of the jury found all the issues in favor of the grain company, and without further comment on the sufficiency of the evidence, we think the jury's finding is abundantly supported.

2. A second argument is that the contract in suit is void under the provisions of the act of congress known as the "Interstate Commerce Act." Section 2 of this act provides: "That if any common carrier　＊　＊　＊

shall,   *   *   *   by any special rate, rebate, draw-back,
or other device, charge, demand, collect, or receive from
any person   *   *   *   a greater or less compensation for
any service rendered or to be rendered in the transporta-
tion of passengers or property   *   *   *   than it charges,
demands, collects, or receives from any other person
*   *   *   for doing him   *   *   *   a like and contempo-
raneous service,   *   *   *   under substantially similar
circumstances and conditions, such common carrier
shall be deemed guilty of unjust discrimination, which
is hereby prohibited and declared to be unlawful." (U.
S. Statutes at Large, vol. 24, ch. 104, p. 379.)   Section 10
of said act provides: "Any person and any officer or
agent of any corporation or company who shall deliver
property for transportation to any common carrier,
*   *   *   or for whom   *   *   *   any such carrier shall
transport property, who shall knowingly and willfully,
by false billing, false classification, false weighing, false
representation of the contents of a package, or false re-
port of weight, or by any other device or means, whether
with or without the consent or connivance of the carrier,
*   *   *   obtain transportation for such property at less
than the regular rate then established and in force,
*   *   *   shall be deemed guilty of fraud   *   *   *   be
subject for each offense to a fine not exceeding five thou-
sand dollars, or imprisonment in the penitentiary for a
term not exceeding two years, or both, in the discretion
of the court.   If any such person or any officer or agent
of such corporation   *   *   *   shall, by payment of
money or other thing of value, solicitation, or otherwise,
induce any common carrier   *   *   *   or any of its offi-
cers or agents to discriminate in his   *   *   *   favor
as against any other consignor   *   *   *   in the trans-
portation of property, or shall aid or abet any common
carrier in any such unjust discrimination, such person or
such officer or agent of such corporation   *   *   *   shall
be deemed guilty of a misdemeanor." (U. S. Statutes at
Large, vol. 25, ch. 382, p. 857, sec. 2.)   We do not under-
stand that the contract in suit violates any provision of

this interstate commerce act.   It is neither pleaded nor proved that by the contract in suit the railway company gave the grain company a special rate, rebate, or a drawback; nor that by the contract was the railway company to collect or receive from the grain company either a greater or less compensation for transporting the grain from Nebraska to Colorado than it charged and collected from other persons for a like and contemporaneous service under substantially similar circumstances and conditions; and there is neither pleading nor proof that the rate of transportation fixed in the contract was obtained by the grain company by false billing, false classification, false weighing, or by any other deception or fraud whatsoever; nor that the railway company intended by the rate fixed in the contract to discriminate in favor of the grain company and against any other person or corporation whomsoever.   In other words, there is neither pleading nor proof in this record that by the contract in suit either the railway company or the grain company intended to violate any provision of the interstate commerce act; nor that the contract was a shift or device gotten up for the purpose of evading the provisions of that act.   If the agreement of the members of the Trans-Missouri Freight Association, that the rate on grain from Nebraska to Colorado should be thirty cents per hundred, was not in force at the time the contract in suit was made, because some member of that association had refused to be longer bound by its agreements, then there is no pleading or proof in this record which shows that the rate of thirty cents per hundred fixed by the contract was an unjust or unreasonable rate, nor that the railway company, by giving this rate to the grain company, was guilty of unjust discrimination.   To give the railway company the benefit of its own theory in this case, it amounts to this: That before and at the time the contract in suit was made it was a member of the Trans-Missouri Freight Association.   It had been transporting grain from Nebraska points to Colorado points for thirty cents per hundred

in car-load lots.   It charged this rate because that was the rate fixed by the association of which it was a member.   Some time before the contract in suit was entered into one of the members of this association withdrew therefrom, thus abrogating the mutual agreement of the members of the association.   At the time the contract was made the railway company had not been advised of the withdrawal of this member.   It made the contract in suit believing that all the members of the association were maintaining the rate on grain fixed by the association; and that if it had been aware that one member of the association had withdrawn therefrom its freight rate on the grain would have been thirty cents per hundred from Omaha to the Colorado points, plus the local rate from the place of shipment of the grain to Omaha.   But conceding all this, we have the finding of the jury, supported by the evidence, that the grain company acted in good faith in obtaining this contract from the railway company, and, relying upon the statements of the railway company's freight agent, that the rate fixed by the freight agent had not been changed, accepted this contract at thirty cents per hundred, and, relying upon the contract, purchased, shipped, and sold the grain at a price based on the freight rate fixed by the contract in suit.   We have, then, a contract entered into by one party under a mistake or misapprehension as to the facts, and which he would not have made had he known the facts; this contract accepted by the other party in good faith, relied and acted upon by him, and in consequence of which he has changed his status, to his injury.   Conceding, then, that both parties to this contract are innocent, the loss must fall upon the railway company, because its mistake was the proximate cause of the other party's injury.

3. Some criticisms are made upon the instructions of the court.   We have examined all of these instructions and reached the conclusion that the plaintiff in error was not prejudiced by any instruction given or refused.   The

finding made by the jury is the only one that could have been correctly made under the evidence, and the judgment of the district court is

AFFIRMED.